UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Henry H. Howe,<br><br>                           Plaintiff,<br><br>    v.<br><br>Steven Gilpin, et al.,<br><br>                         Defendants. | **STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**Case No. 3:20-cv-00013** |

## INTRODUCTORY STATEMENT

A tape recording captured Henry Howe advising his criminal drug client (Paul Lysengen) and a confidential informant (Steven Anderson) about the timing of an event that would prevent a witness (a female confidential informant identified as "CI-13-1527", hereinafter referred to as "EB") from testifying at trial against Lysengen. When asked if "this [the event] shouldn't be happening like five days before he [Lysengen] goes to trial," Howe said "yeah . . . [t]hat . . . looks suspicious you know." Howe also said if the event happens just five days before trial, the authorities "tend to assume something . . . they start with the assumption that it's not a coincidence." Howe's participation in the crime of witness tampering is further confirmed on tape when he tells Lysengen he will cancel Lysengen's preliminary hearing if the State brings EB to the hearing, because her testimony at the hearing would satisfy the Confrontation Clause and could be used at trial even if EB was unavailable to testify at the trial itself.

Howe's own words, caught on tape, along with proof of overt steps taken by others as part of a scheme to harm EB or discredit her as a witness, establish arguable probable cause to charge Howe with conspiracy to commit witness tampering.

Indeed, in his deposition, Howe acknowledged that giving advice on how to commit a crime makes you a "co-conspirator."

The presence of arguable probable cause is a complete defense to this lawsuit in which Howe alleges violations of his Fourth Amendment rights arising from his arrest on criminal charges for conspiracy to harm EB or tamper with her as a witness. For this reason and others, State defendants Gilpin and Kraft move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and ask that Howe's complaint against them be dismissed in its entirety.

## FACTUAL BACKGROUND

The facts that gave rise to this lawsuit started with a controlled purchase of drugs from Lysengen, who later conspired with others to discredit or harm the person who purchased the drugs from him, confidential informant (CI) EB. Howe became involved in the plan to harm or discredit EB in his capacity as Lysengen's criminal defense attorney. The plot against EB was brought to the defendants' attention by Anderson. Although this lawsuit is grounded on a claim that the defendants failed to "vet" Anderson properly before using him as a CI, a discussion of the relevant facts establishes not only that the defendants independently corroborated numerous facts provided by Anderson and did not set forth any deliberate falsehoods in the arrest warrant affidavit, but that the probable cause for Howe's arrest did not depend upon Anderson's credibility.

On May 22, 2013, CI EB bought approximately seven grams of methamphetamine from Lysengen during a controlled buy in a residence in Warsaw, North Dakota, located in Walsh County. EB wore a wire during the transaction. As a result of this unlawful sale of drugs, Lysengen was charged in File No. 50-2013-CR-00231 with delivery of Schedule II controlled substance. See State v. Lysengen,

Walsh County North Dakota District Court Case No. 50-2013-CR-00231; Howe Ex. 8 ¶¶3-6 (ECF 84-9).[1]  Howe represented Lysengen in this matter.

On May 24, 2013, two days after the controlled buy, law enforcement executed a search warrant at the same residence and discovered multiple types of drugs and drug paraphernalia, including some drugs packaged for resale.  As a result of the search, Lysengen was charged in File No. 50-2013-CR-00435 with three counts of unlawful possession of drug paraphernalia, three counts of unlawful possession of controlled substances, and three counts of unlawful possession of controlled substances with intent to deliver.  See State v. Lysengen, Walsh County North Dakota District Court Case No. 50-2013-CR-00435; Howe Ex. 8 ¶6 (ECF 84-9).  Howe represented Lysengen in this matter as well.

In the course of representing Lysengen, Howe shared the tape recording of the May 22 controlled buy with Lysengen. See Declaration of Delicia Glaze In Support Of Defendants Delicia Glaze And Barbara Whelan's Motion For Summary Judgment (Glaze Declaration) ¶¶9-10, 18(D) (ECF 82), Glaze Ex. 22 (ECF 84-19). After Howe shared the tape recording with Lysengen, Lysengen was able to identify EB's voice on the tape as the CI who participated in the controlled buy. Id.  After recognizing EB's voice, Lysengen began discussing with others his desire to harm EB, or to do

---

[1] The deposition transcripts and exhibits of Howe, Glaze, Gilpin and Kraft, and the deposition exhibits from the deposition of Whelan are attached to the Affidavit of Daniel L. Gaustad.  The State defendants will be referring to exhibits submitted by the County defendants whenever possible to avoid duplicate filings.  Citation to deposition transcripts will be to the person's last name with reference to the page number and line separated by a colon.  For example, "Gilpin Depo, 10:2 – 11:5," is reference to Gilpin's deposition testimony starting at page 10, line 2 through page 11, line 5.  Reference to deposition exhibits will be by citation to the person's last name, followed by the deposition exhibit number.  Bates numbers will be provided in the citation for documents that are not deposition exhibits.

something that would discredit her prior to her potential trial testimony against him. For example, Lysengen frequently communicated by both phone and letter with his son, Anthony Haase, while the latter was in jail. The phone calls were recorded by the jail. The defendants believe in one of these phone calls Lysengen told Haase that Howe had advised Lysengen that EB needs to be "set up." See Glaze Declaration Ex. 1 ¶¶7-8 (Bates Number W-G 3401) (ECF 82-1).

On January 14, 2014, defendants Gilpin and Glaze received information from Grand Forks Assistant State Attorney David Jones that a CI (EB) working with the Grand Forks Narcotics Task Force (GFNTF) may be in danger. Jones received this information from David Ogren, an attorney representing Steve Anderson, who said he had information about individuals who were discussing plans to harm or discredit EB. Glaze Declaration Ex. 1 ¶14 (Bates Number W-G 3402) (ECF 82-1). David Jones provided Gilpin and Glaze with a map to EB's residence and a picture of EB which had been obtained from Anderson and Ogren. Gilpin Depo, 57:14-16 (ECF 84-24). Anderson had obtained the map and picture via Lysengen, whom he was living with at the time. Concerned for EB's safety, Gilpin and Glaze arranged a face-to-face meeting with Anderson and his attorney that same day. Glaze Ex. 22 (ECF 84-19), Glaze Declaration Ex. 1 ¶¶17-18 (Bates Number W-G 3402-03) (ECF 82-1).

At the face-to-face meeting with Ogren and Anderson, Anderson told Gilpin and Glaze that Lysengen had a conversation with an individual named Wesley Smith and others regarding EB's role in the May 22 undercover buy. According to Anderson, Smith said that EB should end up as "fish bait on the north side of the Drayton Dam" for setting up Lysengen, and asked Lysengen "[d]o you know that within seventy-two hours a two hundred pound person would be one hundred pounds?" According to Anderson, Smith then referred to the pending criminal charges against Lysengen and told Lysengen that he was "dead if you get sentenced;

4

you don't have anything to lose."  Referring to EB, Lysengen replied "I agree the bitch has to go."  Glaze Ex. 22 ¶¶4-5 (ECF 84-19); Glaze Declaration Ex. 1 ¶¶17-18 (Bates Number W-G 3402-03) (ECF 82-1).

Following the January 14 meeting, the GFNTF took steps to corroborate the information that Anderson had provided at that time and thereafter.  The facts that GFNTF independently corroborated after the January 14 meeting with Anderson included the following:

1) Anderson reported that Wesley Smith was involved in Lysengen's plans to harm or discredit EB.  The GFNTF knew that Smith and Lysengen knew each other because they were both from Saint Thomas, North Dakota, and were close in age.  See Glaze Declaration Ex. 1 ¶20 (Bates Number W-G 3404) (ECF 82-1).

2) Anderson reported that EB's first name was Elle.  The GFNTF knew this information was accurate.  See id.

3) Anderson reported that EB was interested in antiques.  The GFNTF knew this information was accurate.  See id.

4) Anderson reported that Wesley Smith had been to EB's residence on January 12, 2014.  Special Agent Kraft confirmed this fact directly through EB by texting her and asking if Smith had come to her residence.  See Glaze Declaration Ex. 3 (Bates Number W-G 319) (ECF 82-3).   Through independent surveillance of Smith, other law enforcement also confirmed that Smith was at EB's residence on January 12, 2014.  Glaze Ex. 22 (ECF 84-19).   In addition, the GFNTF knew that Smith and EB had been involved in a previous relationship.  See Glaze Declaration Ex. 1 ¶20(I) (Bates Number W-G 3404) (ECF 82-1).

5

5) Anderson reported that an individual named Rodney Avron was currently in Arizona picking up methamphetamine from someone named Rick. GFNTF Officer Lloyd had also been informed by an independent source that Rodney Avron was going to make a trip to Arizona to pick up methamphetamine.  Glaze Ex. 22 ¶7 (ECF 84-19).  The GFNTF placed Avron in Arizona through law enforcement traffic stops and prior interviews.  See Glaze Declaration Ex. 1 ¶18(H) (Bates Number W-G 3403) (ECF 82-1).

6) At the January 14 meeting, Anderson discussed the hand drawn map of the location of EB's residence and reported that Wesley Smith drew the map for Lysengen.  The GFNTF knew the map accurately depicted the location of EB's residence.  See Glaze Declaration Ex. 1 ¶15 (Bates Number W-G 3402) (ECF 82-1).  In addition, a similar hand drawn map was found in a search of Smith's home on January 30, 2014. Glaze Declaration Ex. 10 (Bates Number W-G 2708) (ECF 82-10).

7) At the January 14 meeting, Anderson reported that Wesley Smith was in possession of a 1911 pistol and a .380 pistol.  Smith's possession of a .380 pistol was later confirmed when Smith's residence was searched pursuant to a warrant on January 30, 2014, and law enforcement discovered both a .380 handgun and ammunition rounds.  The search also revealed that Smith had a picture of EB.  See Glaze Declaration Ex. 10 (Bates Number W-G 2840, 2692-96) (ECF 82-10).

8) Jail calls and letters between Lysengen and Haase discussing EB confirmed Anderson's report that Lysengen was upset with EB and was plotting to harm or discredit her.  Glaze Declaration Ex. 1 ¶¶ 7-12 (Bates Number W-G 3401-02) (ECF 82-1).

9)  The GFNTF confirmed that Lysengen was living with Anderson.   Glaze
    Declaration ¶ 5(1) (ECF 82); Ex. 1 ¶ 26 (Bates Number W-G 3405) (ECF 82-
    1). Anderson reported that Lysengen was suffering from liver cancer.   The
    GFNTF confirmed that this information was accurate.   Glaze Declaration
    Ex. 1 ¶5(10) (ECF 82).  Anderson reported that Lysengen had a brother that
    worked at a bank.   The GFNTF knew this information was accurate.   Glaze
    Ex. 22 ¶ 11; Glaze Declaration ¶ 5(9) (ECF 82).

10) Anderson reported that Lysengen had paid an individual to "fuck up" EB,
    but  that  the  individual  was  sent  back  to  the  North  Dakota  State
    Penitentiary  on  a  probation  violation  before  any  action  took  place.
    Anderson did not know the individual's name, but that he had been sent
    back to the Penitentiary from Walsh County.   The GFNTF independently
    determined that there was an individual named Joshua Powers from Walsh
    County whose probation was revoked shortly before Christmas 2013.  Glaze
    Declaration Ex. 1 ¶¶24-25 (Bates Number W-G 3404-05) (ECF 82-1).

After the January 14 meeting with Anderson, the GFNTF was worried about
EB's well-being.  Gilpin Depo 55:18-20 (ECF 84-24).   The GFNTF asked Anderson to
act as a CI on their behalf to investigate the matter further, and Anderson completed
the Bureau of Criminal Investigation's (BCI's) SFN #10596, or cooperating individual
agreement and personal history report (CI form). Gilpin Ex. 28 (ECF 84-26).[2]  As part
of that process, the GFNTF performed a background check of Anderson.   This is
reflected by the presence of a state identification number (SID) on the CI form.  See

---

[2] Throughout the BCI reports in this case, EB is referred to as CI 13-1527, and
Steven Anderson is referred to as CI 14-2995.

id.; see also Gilpin Depo 73:8 - 77:14 (ECF 84-24) (discussing the meaning of an SID number on the form).

Anderson's CI form also lists an FBI number, which means that a criminal background check referred to as a Triple I could have been run at that time as well. Gilpin Ex. 28 (ECF 84-26), Gilpin Depo 76:16 - 77:3 (ECF 84-24). The form was completed by GFNTF Officer Glaze, see Gilpin Depo 67:20 - 68:6 (ECF 84-24), and listed information about Anderson's criminal history in states outside of North Dakota. See Gilpin Ex. 28 (ECF 84-26).

While working as a CI for the GFNTF, Anderson reported that on January 22, 2014, Lysengen met with his attorney, Howe. There was a discussion about EB's role as CI/witness against Lysengen during the meeting. Anderson reported that Howe stated at one point that "It would be good if the fucking bitch died or went away" in reference to EB. Anderson further reported that Howe said Lysengen would not be facing half of what he was currently facing if EB did not show up to testify against him at trial. Anderson reported that Lysengen responded "If she shouldn't show up, then she won't show up for court." Anderson reported that Howe advised Lysengen to take care of EB by the end of March so that it did not look funny. Glaze Declaration Ex. 1 ¶22 (Bates Number W-G 3404) (ECF 82-1).

During Gilpin's deposition, Howe's counsel asked whether using the word "bitch" would sound more like something Anderson would say or something Howe would say, implying that Anderson fabricated what he was reporting to the GFNTF. See Gilpin Depo 60:20 - 62:5 (ECF 84-24). The word "bitch" is clearly something Howe says, as he used the word during his own deposition. See Howe Depo 251:4 (ECF 84-1).

Anderson also quoted Howe as using the word "fucking" when describing EB. See Glaze Declaration Ex. 1 ¶22 (Bates Number W-G 3404) (ECF 82-1) ("[Anderson]

quoted HOWE as stating, 'It would be good if the fucking bitch died or went away.'"). The word "fucking" is clearly something Howe says, as he used the word over twenty-five times during his deposition despite knowing the deposition was being video recorded.  See Howe Depo 35:14; 83:17; 88:2;  102:16; 112:10; 113:5; 114:11; 121:5; 123:1, 7, & 19; 124:15; 125:22; 126:17; 133:1; 156:21; 176:8 & 20; 207:23, 221:18; 222:4; 251:4; 253:8; 259:11; 262:9; 264:11; 267:13 & 18; 269:16; and 272:24 (ECF 84-1).

In addition, consistent with Anderson's report that Howe used the word "fucking" together with the word "bitch" to describe EB, Howe also used the word "fucking" together with the word "bitch" during his deposition to describe Whelan. See id. at 251:4 ("She is a **fucking** crazy **bitch** . . .") (emphasis added).

After learning that Lysengen would be meeting with Howe again on January 24, defendant Gilpin sought advice from defendant Whelan about fitting Anderson with a body transmitter to record the conversation inside Howe's office.  See Glaze Ex. 26 ¶¶2-4 (ECF 84-23); see also Gilpin Depo 48:9 - 50:9 (ECF 84-24).  Anderson was in fact equipped with a body transmitter, and the subsequent conversation that took place in Howe's office was recorded.  The full recording is included at Howe Ex. 12 (Bates Number 00010) (ECF 84-13).

During the January 24 meeting, EB's role as a witness against Lysengen was discussed.  At one point Anderson asks Howe "[i]f this [EB] bitch doesn't show up or gets dirty [discredited], or whatever, is he [Lysengen] gonna win this deal [his criminal case] or are we just out pissing in the snow?"  Id. at 2:18:16.[3]  Howe responds that Lysengen will likely win his trial if EB is not available to testify.  Id. at 2:18:25. ("Ah, yeah. If, if she's not around.").  Howe explains that EB is a critical part of the

---

[3] All time stamp references are closest approximations.

State's case against Lysengen because, even though the controlled buy was recorded, EB was the only person that could testify to the activity taking place during the buy. Id. at 2:18:29. ("They've gotta have her … because, yeah there was somebody listening in, but the somebody that was listening in couldn't see what was happening."); id. at 2:19:38 ("Unless they had some independent basis for discovering information that was unrelated to her.  They've really got to have her.").

Then, most significantly, Howe advises Lysengen on the timing of an event that would prevent EB from testifying against him at trial.  Anderson asks Howe, "[a]nd I take it this shouldn't be happening like five days before he goes to trial." Id. at 2:21:30.  Howe responds: "Well, I, I think that it gives the State more to think about if they know that they're gonna go through a trial and it's gonna be a little bit miserable to go through a trial and what are they going to get out if it."  Anderson says: "Yeah, without their star witness." Id. at 2:21:35.  This advice was consistent with the advice Anderson reported Howe as giving Lysengen sometime prior to the recorded January 24 meeting (i.e., to take care of EB by the end of March), and further corroborated the information that Anderson was providing to the GFNTF.

The subsequent exchange between Howe and Anderson indicates Howe understood the discussion was about the timing of an event that would prevent EB from testifying against Lysengen at trial.

> **Howe**:  "You know, if they, if they, yeah.  That also looks suspicious, you know.  If somebody gets ah . . ." Id. at 2:21:56.

> **Anderson**: "Yeah, disappears five days before action."

> **Howe**:  "Yeah then they tend to assume something.  They they . . . you know they start off with the assumption that it's not a coincidence."

Id. at 2:22:04 through 2:22:17.

10

A little later in the recording, Howe's understanding that the conversation is about preventing EB from testifying at trial is confirmed when Lysengen's preliminary hearing is discussed.  During that discussion, Howe explains the need to cancel the preliminary hearing if EB is called to testify because her testimony would then satisfy the Confrontation Clause even if she did not appear at trial.  Anderson asks Howe: "So does that, does that [EB] gal, does she show up at this hearing or what?"  Howe responds: "No, they won't have her; she will not come."  Id. at 2:38.35.  Howe further explains: "In fact, if she did come, I might cancel the preliminary hearing but they don't, they haven't figured that out."  Id. at 2:38:46.  "If you have an option to cross-examine a witness and then later the witness doesn't show up, it may be that your, your confrontation clause requirement has been met."  Id. at 2:39:03.[4]

Howe acknowledged in his deposition that an attorney is not permitted to give advice to a client about how to successfully complete a crime, and that doing so makes you a co-conspirator:

> Q.  So, but we'd agree that one place where the line is drawn is that you can't give advice on how to commit a crime?
>
> A.  And, and you can't recommend making a crime, whether you're doing a – you can't, you can't say, well, the way to get rid of this is to, you know, do this or do that, which involves in getting rid of, of a person or a client or maybe even having them sent to a long jail prison.
>
> . . .
>
> Q.  So that's yes, you'd agree that one of the limits is, is you can't give advice to a client on how to commit a crime?
>
> A.  Essentially.  You can't, you can't give information that will enable someone to have a crime.

---

[4] The relevant portions of the January 24 tape-recorded conversation in Howe's office are also outlined in defendant Glaze's subsequent report describing the incident.  See Glaze Ex. 25; Glaze Declaration Ex. 6 (Bates Number W-G 2527 – 2534) (ECF 82-6).

Q. **Or be successful in carrying out a crime**?

A. **Well, yeah.  Then you're a co-conspirator**.

Howe Depo 317:14 - 318:11 (emphasis added) (ECF 84-1).

Between January 24 and 28, Anderson wore a wire and captured additional conversations between Smith and Lysengen about the plans to harm EB.  Lysengen called Smith to get EB's phone number and provided it to Anderson so that Anderson could arrange a meeting with EB at a storage unit in Grand Forks to discuss antiques. Anderson reported that the plan was for Anderson to drug EB during the meeting, get her body into his car, and to make it look like she died of asphyxiation. Glaze Declaration Ex. 4 ¶3 (Bates Number W-G 485) (ECF 82-4).

Concerned for EB's safety, and due to the evidence of a conspiracy to harm EB, defendant Glaze applied for an arrest warrant for Lysengen, Smith, and Howe on January 30.  Howe Ex. 9 (ECF 84-10).  The six-page affidavit describes in detail the facts establishing probable cause, including Lysengen's jailhouse communications with Haase discussing their knowledge that EB was the CI involved in Lysengen's controlled buy, the fact that both were upset with EB for her role as a CI, and the steps taken in furtherance of a conspiracy to harm EB, which included preparing a map of her home, obtaining her photograph, and planning a ruse about meeting to discuss antiques with her as a means of contacting her to facilitate harming her.  Id. ¶¶8-10.

As relevant to Howe, paragraph 12 of the affidavit describes information Anderson reported about Howe's comments prior to the January 24 recorded conversation, and paragraph 13 of the affidavit summarizes Howe's comments during the January 24 recorded conversation.

Paragraph 12 of Glaze's affidavit states as follows:

> After receiving the report from [Anderson] on January [14], 2014, the GFNTF began utilizing a body transmitter and digital recorders on [Anderson]. Various forms of surveillance were conducted, corroborating that [Anderson] and Lysengen were often together.  [Anderson] informed the GFNTF that he had recently attended meetings between Howe and Lysengen.  [Anderson] informed the GFNTF that he a discussion with Howe about making [EB] "go away." [Anderson] quoted Howe as saying "It would be good if the B***** died or went away [referring to [EB]]. [Anderson] said that Howe stated, "Then Paul Lysengen wouldn't be facing half the shit he's facing." . . . [Anderson] informed them that a meeting was planned at the office of Henry Howe. [Anderson] also attended another meeting at Howe's office.  Present were [Anderson], Lysengen and Howe.  At that meeting, Lysengen asked what would happen if [EB] didn't show up for Court.  Howe responded, "They wouldn't have a case."  [Anderson] said, "Wouldn't it be easier to just set [EB] up?"  Howe replied, "It would be better if she just didn't show up."  Lysengen then stated to Howe, "If she shouldn't show up, then she won't show up for Court."

Howe Ex. 9 (ECF 84-10).

There is no evidence that paragraph 12 of the arrest warrant affidavit contains any deliberate falsehoods by defendant Glaze.  Howe acknowledged during his deposition that he had no information that paragraph 12 was anything other than an accurate reporting of what Anderson relayed to Glaze.

> Q. Okay. And I understand that.  But are you aware of anything in paragraph 12, that, that Ms. Glaze didn't transcribe appropriately as to what Anderson was telling her.
>
> A. That may be exactly what . . . he told her.
>
> Q. Okay.
>
> A. But he's not – he's a lying credible opportunist.
>
> Q. Okay.
>
> A. So I don't know, you know.
>
> Q. Okay.

A. I don't know what he told her.  Maybe it's exactly what she wrote down.

Howe Depo 176:21 - 177:11 (ECF 84-1).

Paragraph 13 of Glaze's warrant affidavit describes information about the recorded conversation that took place in Howe's office on January 24.  Paragraph 13 states as follows:

> On January 24, 2014, [Anderson] wore a body transmitter into a meeting taking place between Lysengen, [Anderson] and Henry H. Howe.  Howe does not represent [Anderson], who has separate counsel.  The recording of this meeting clearly picks up numerous statements by Howe evidencing Howe's knowledge and complicity of the plan to make [EB] "go away" so that she could not testify in the cases pending against Lysengen, and in which Howe was representing Lysengen.  Howe explains to Lysengen and [Anderson] that the presence of [EB] is necessary i[f] the State were to proceed with the prosecution of Lysengen.  Howe opines that the controlled purchase done by [EB] on May 22nd, at the Lysengen/Haase residence, was the incident upon which the subsequent search warrant was issued.  He tells them that if [EB] is not there, it is like a "house of cards" that falls down.  The conversation then proceeds to a discussion about [EB] being gone 5 days before trial.  Howe tells them that it need to happen more than five days before trial, because otherwise it looks suspicious.  Howe also opined that it gives the State longer to think about the difficulties of trial without the witness.  Howe also stated that if the witness disappears five days before trial, "They [referring to the State] start out with the assumption that it isn't a coincidence.  It blows me away, but that's the message."  The conversation then moves to the preliminary hearing, and when asked if [EB] would show up at the preliminary hearing scheduled for January 30, 2014, Howe said no, the State won't have her come.  Howe then goes on to say that if [EB] does attend, he would likely cancel the preliminary hearing.  He explains his strategy is that if [EB] were to appear at the preliminary hearing and be subject to cross-examination by Howe, if [EB] does not show up for the trial, then the State could likely use her testimony from the preliminary hearing at the trial.  It was clear that Howe was conspiring with them to ensure that [EB] would not be on record in a criminal procedure, subject to cross-examination by Lysengen, so that the Confrontation Clause would be met.

Howe Ex. 9 (ECF 84-10).

There is no evidence that paragraph 13 of the arrest warrant affidavit contains any deliberate falsehoods by defendant Glaze.  The tape recording of the conversation summarized in paragraph 13 is available for the Court's review to confirm that the information in the affidavit accurately describes what is captured on tape.  Howe acknowledged during his deposition that the tape recording speaks for itself.

> A.  But what, what's on the recording - - -
>
> Q.  It is what it is?
>
> A.  What you've got is what you have.  What I've said is what I have.
>
> Q.  Okay. So what's on the, on the recording –
>
> A.  End of discussion.
>
> Q.  Okay. So what's on the recording, it is what it is as far as what you said?
>
> A.  Yeah.

Howe Depo 227:4-13 (ECF 84-1).

The arrest warrant affidavit was presented to State District Court Judge M. Richard Geiger.   Based upon his review of the affidavit, Judge Geiger signed an arrest warrant against Howe for the crime of conspiracy to commit murder in violation of N.D. Cent. Code § 12.1-06-04.  Howe Ex. 10 (ECF 84-11).  Howe was arrested pursuant to the warrant on January 31. Glaze Declaration Ex. 9 (Bates Number W-G 3514-15) (ECF 82-9).  On April 24, 2014, the charge against Howe was amended from conspiracy to commit murder to the charge of conspiracy to tamper with a witness and/or informant in a criminal proceeding in violation of N.D. Cent. Code §§ 12.1-06-04 and 12.1-09-01(1).  See Whelan Declaration Ex. 14 (Bates Number W-G 369-72) (ECF 83-3).

On May 8, 2014, defendant Whelan decided to dismiss the charge against Howe. Whelan explained her rationale for the dismissal referencing "evidence that has come forth about [Anderson] and his past involvement in similar situations where he accused other criminal defendants and their attorneys of being involved in plots to murder witnesses[.]" Whelan Ex. 16 (Bates Number W-G 283) (ECF 83-5).   Whelan was referencing information about Anderson from Sarpy County, Nebraska and Becker County, Minnesota, that neither Gilpin nor Kraft knew anything about until after March 27, 2014.   See Gilpin Affidavit ¶6; Kraft Affidavit ¶9.   Notably, Whelan still believed probable cause existed for the charge against Howe, but was concerned whether Howe's role in the conspiracy rose to "the level of proof beyond a reasonable doubt" that would be required at a trial.   Whelan Ex. 16 (Bates Number W-G 283) (ECF 83-5).   Ultimately, both Lysengen and Smith, the other two co-conspirators that had been charged with Howe, pleaded guilty to the amended charge of tampering with a witness.   Whelan Declaration Ex. 17 (Bates Number W-G 799-800; 914-15) (ECF 83-6).

On January 29, 2020, Howe filed a complaint in federal district court against defendants Whelan, Glaze, Gilpin and Kraft, alleging violations of his Fourth Amendment rights in the following respects: (1) to be free from a warrant based upon deliberate falsehood or reckless disregard for the truth; (2) to be free from a warrant not supported by probable cause; and (3) malicious prosecution.   See ECF 1.   The following are the totality of the allegations against state defendants Gilpin and Kraft:

1)   Howe had multiple previous dealings with Gilpin in representing Howe's clientele in the field of criminal defense.   Id. ¶11.

2)   Gilpin intentionally or recklessly disregarded the fact that a confidential informant named Steven Harold Anderson had a documented history of telling law

16

enforcement personnel and prosecutors fictitious stories about lawyers supposedly conspiring to kill people.  Id.

3)      Gilpin supervised and directed GFNTF investigations that Howe has dealt with in the past twenty-five years.  Id. ¶15.

4)      Gilpin and Kraft intentionally or recklessly cultivated and relied upon Steven Harold Anderson as a confidential informant without investigating or vetting him, in that Anderson had been investigated by law enforcement agencies for making elaborate false statements to police that were similar to the alleged false statements against Howe.  Id. ¶¶16, 18.

5)      Gilpin and Kraft had actual knowledge of Steven Harold Anderson's criminal history or acted with reckless disregard of Anderson's past in using him as a confidential informant against Howe.  Id. ¶28.

6)      Gilpin and Kraft and the other defendants acted in concert to present false evidence in an affidavit that contained a deliberate falsehood or a reckless disregard for the truth that caused Howe to be falsely charged with conspiracy to commit murder.  Id. ¶29.

7)      Gilpin and Kraft knew, or absent reckless disregarding conduct, should have known he was generating false evidence in support of an arrest warrant, or false evidence not supported by probable cause.  Id. ¶30.

8)      Gilpin and Kraft acted in concert with other defendants to generate false information from confidential informant Steven Harold Anderson.  Id. ¶33.

9)      Gilpin and Kraft acted in concert with other defendants to develop and generate false evidence that was incorporated into Glaze's arrest warrant affidavit.  Id. ¶36.

10)    Gilpin and Kraft acted in concert with the other defendants to generate false evidence during the course of the investigative and prosecutorial phases of the case against Howe.  Id. ¶40.

11)    Gilpin and Kraft cultivated and used confidential informant Steven Harold Anderson to generate false evidence incorporated into the Delicia Glaze arrest warrant affidavit and subjected Howe to arrest and prosecution in the absence of probable cause.  Id. ¶57.[5]

## LAW AND ARGUMENT

### I.    This case is appropriate for summary judgment.

Summary judgment is appropriate when the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Eighth Circuit has recognized the usefulness of the summary judgment procedure in avoiding useless and time consuming trials. Vacca v. Viacom Broad. of Mo., Inc., 875 F.2d 1337, 1339 (8th Cir. 1989); see also Olson v. Pennzoil Co., 943 F.2d 881, 883 (8th Cir. 1991).  In so doing, the Court has relied upon the well-established standards for deciding summary judgment questions.  First, summary judgment should be granted when "the moving party has established the right to a judgment with such clarity as to leave no room for controversy." Vacca, 875 F.2d at 1339 (internal quotations and citation omitted).  Second, the evidence "is viewed in the light most favorable to the nonmoving party, and the nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts." Id. (internal quotations and citation omitted).  The Eighth Circuit has identified the burden in summary judgment: "When the moving party produces

---

[5] Howe later filed an amended complaint, see ECF 56, but the liability allegations against Gilpin and Kraft remained the same.

credible evidence that establishes there is no genuine issue of material facts, the opposing party must produce specific facts demonstrating a genuine issue for trial." Westchem Agric. Chems., Inc. v. Ford Motor Co., 990 F.2d 426, 429 (8th Cir. 1993).

In this case, Howe alleges he was subjected to an arrest warrant that was based upon a deliberate falsehood or submitted in reckless disregard for the truth, and that he was subjected to an arrest warrant unsupported by probable cause.  But discovery in this case failed to produce any specific facts demonstrating a genuine issue for trial.  The arrest warrant does not contain a deliberate falsehood, nor is there any evidence that the arrest warrant was submitted in reckless disregard for the truth.

In any event, whether the arrest warrant was supported by probable cause is an issue of law for the Court, not an issue of fact.  See, e.g., Duhe v. City of Little Rock, Ark., 902 F.3d 858, 862 (8th Cir. 2018).  Moreover, all the defendants are entitled to qualified immunity if the arrest warrant was merely supported by *arguable* probable cause.  See, e.g., McCabe v. Parker, 608 F.3d 1068, 1077–78 (8th Cir. 2010).  Qualified immunity is also an issue of law for the Court to decide, not an issue of fact.  See Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995) ("Both probable cause and qualified immunity are ultimately questions of law.").  As Howe acknowledges, the tape recording which captured him giving advice on how to commit the crime of witness tampering speaks for itself:  there are no issues of fact for a jury to resolve in this case.  This Court must therefore address as matters of law the issues of probable cause, arguable probable cause, and qualified immunity.

## II. Gilpin and Kraft are entitled to summary judgment because they did not sign the arrest warrant affidavit.

Howe's complaint alleges the defendants violated his Fourth Amendment rights.  More specifically, he asserts Howe's arrest warrant contained a deliberate

19

falsehood or reflects a reckless disregard for the truth, referencing the type of claim recognized in Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996). See ECF 56 ¶29 n.4 (quoting Odom v. Kaizer, 638 F. App'x 553, 554 (8th Cir. March 7, 2016) (in turn quoting Bagby, 98 F.3d at 1098)).

To survive summary judgment on the type of claim recognized in Bagby, Howe must demonstrate that a particular defendant submitted "a false and misleading affidavit in support of the warrant for his arrest." Murray v. Lene, 595 F.3d 868, 872 (8th Cir. 2010). "A fourth amendment violation occur[s] if [the particular defendant's] probable cause statement contained a deliberate falsehood or [the particular defendant] acted with reckless disregard for the truth when [she] prepared it." Id. (internal quotation marks and citation omitted).

The fact that neither Gilpin nor Kraft made statements in an arrest warrant affidavit is reason alone to grant their motion for summary judgment. To be liable under Section 1983, an individual defendant must be personally responsible for a deprivation of a constitutional right, i.e., the defendant must have done "some affirmative act, participated in the affirmative act of another, or failed to perform an act which resulted in the deprivation of plaintiff's federally protected rights." Temple v. Dahm, 905 F. Supp. 670, 672 (D. Neb. 1995). Howe cannot demonstrate that either Gilpin or Kraft were personally involved in or had direct responsibility for signing the arrest warrant affidavit. See Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) ("Appellant does not allege that Baltz was personally involved in or had direct responsibility for incidents that injured him. His claims, therefore, are not cognizable in § 1983 suits."); see also Jensen v. Satran, 633 F. Supp. 1187, 1189 (D.N.D. 1986), aff'd, 808 F.2d 840 (8th Cir. 1986) (dismissing § 1983 claims against individual defendants whom plaintiff failed to demonstrate had "personally committed any act which injured him").

Gilpin is not liable under Section 1983 merely by virtue of being Glaze's supervisor. "In a § 1983 case an official 'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability." Nelson v. Corr. Med. Servs., 583 F.3d 522, 534-35 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 14 556 U.S. 662, 677 (2009)). Nor is Kraft liable merely by virtue of being a member of the GFNTF.

The Eighth Circuit has not extended Section 1983 liability for a warrant issued without probable cause to a non-affiant defendant. See Cooper v. Martin, 634 F.3d 477, 480 (8th Cir. 2011). The fact that Gilpin and Kraft may have played some role in the investigation or may have even provided some information to Glaze in her preparation of the arrest warrant, is immaterial unless Howe presents evidence that Gilpin or Kraft "prepared or presented the warrant or were fully responsible for its preparation or presentation." Michalik v. Hermann, 422 F.3d 252, 261 (5th Cir. 2005). This is because the affiant is the only officer "in a position to see the whole picture, to understand [her] responsibility and thus to fully assess probable cause questions." Id.; see also Hampton v. Oktibbeha Cnty. Sheriff Dep't, 480 F.3d 358, 365 (5th Cir. 2007) (reversing a district court's denial of summary judgment against two non-affiant officers and granting them qualified immunity where the plaintiff did "not allege that Whitfield or Lindsey was the affiant officer or the officer who actually prepared the warrant application with knowledge that a warrant would be based solely on the document prepared") (internal quotation marks omitted); cf. Wheeler v. City of Lansing, 660 F.3d 931, 942 (6th Cir. 2011) (reversing summary judgment in favor of a non-affiant defendant but only after determining he "played a *major role* in preparing the affidavit and procuring the warrant") (emphasis added).

In response to this motion, therefore, it is incumbent upon Howe to come forth with evidence of specific acts committed personally by Gilpin or Kraft that violated

21

Howe's Fourth Amendment rights.  Howe cannot rely upon the general allegations against Gilpin and Kraft in his complaint to defeat summary judgment. As discussed in more detail below, however, the claims against all defendants, including Glaze as the particular officer who signed the arrest warrant affidavit, fail.   Howe cannot show the portions of the affidavit he challenges contain any deliberate falsehoods, or that Glaze acted with reckless disregard for the truth when she submitted the arrest warrant affidavit.

III. **There is no evidence that the arrest warrant affidavit contains a deliberate falsehood or that it was submitted in reckless disregard for the truth.**

   A. **Defendant Glaze did not include any deliberate falsehoods in the arrest warrant affidavit.**

   Significantly, Howe only challenges the paragraphs of the arrest warrant affidavit that discuss him, namely, paragraphs 12 and 13.  See ECF 56 at ¶ 53 ("The January 30, 2014 affidavit submitted by defendant DELICIA GLAZE of the GFNTF in support of an arrest warrant in this case alleges actions by then-defendant Henry H. Howe are (sic) described in only two (2) of the eighteen (18) paragraphs [*Paragraphs 12 and 13*] of that document[.]"). But Howe does not identify any specific falsehoods contained in paragraphs 12 or 13 in his complaint.   See id.  In addition, he does not refer to any other paragraphs of the arrest warrant affidavit in his complaint, identify any specific falsehoods contained in other paragraphs, or challenge any paragraphs of the arrest warrant affidavit that address probable cause against Howe's co-conspirators (which includes information about the overt acts committed in furtherance of the conspiracy).  Id.  Thus, Howe has not alleged and cannot show a Fourth Amendment violation of Howe's rights unless he demonstrates that paragraphs 12 or 13 contain a deliberate falsehood.  See United States v. Johnson, 64 F.3d 1120, 1127 (8th Cir.1995) (addressing the lack of a Fourth

Amendment violation as to "unchallenged portions of an affidavit"); <u>see also</u> <u>Schwartz v. Pridy</u>, 94 F.3d 453, 457 (8th Cir. 1996).

> ### 1) Paragraph 12 accurately reports information provided by Anderson.

Paragraph 12 of the arrest warrant affidavit relays information that Anderson reported to Glaze prior to the January 24 recorded conversation that included Howe. Significantly, Howe acknowledges he has no information to indicate Glaze did not accurately report in her affidavit exactly what Anderson relayed to her. <u>See</u> Howe Depo 176:21–177:11 (ECF 84-1). Stated another way, Howe has no evidence that Glaze deliberately falsified information supplied by Anderson.

The proper focus in determining whether Glaze was entitled to rely upon Anderson centers on the ***information*** he provided, and not (as Howe contends) on investigating Anderson's criminal background. <u>See, e.g.</u>, <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir.1993) ("The core question in assessing probable cause based upon information supplied by an informant is whether the ***information is reliable***.") (emphasis added). "There are several ways to establish the reliability of a source and the source's information." <u>United States v. Sinnawi</u>, No. 1:19-cr-161, 2020 WL 625287, at *3 (D.N.D. Feb. 10, 2020), <u>appeal dismissed,</u> 854 F. App'x 766 (8th Cir. 2021). "One manner is independent corroboration of information provided by the source." <u>Id.</u> (citing <u>United States v. Keys</u>, 721 F.3d 512, 518 (8th Cir. 2013)).

> Information may be sufficiently reliable to support a probable cause finding if . . . it is corroborated by independent evidence. . . . If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.

Keys, 721 F.3d at 518 (quoting Williams, 10 F.3d at 593).  The independent corroboration of the information provided by a CI includes corroboration of minor and innocent details.  United States v. Buchanan, 574 F.3d 554, 563 (8th Cir. 2009).

Two additional considerations in determining the reliability of the information provided by a CI is whether the CI is providing first-hand knowledge, and whether law enforcement officers have an opportunity to meet with the CI face-to-face.  United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994).  Information from an informant that is based upon first-hand knowledge is given greater weight.  Id.; see also United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990) (noting the inherent indicia of reliability in "the richness and detail of a first hand observation").  And a face-to-face meeting with the CI enhances reliability of the information provided because the officer has the opportunity "to determine whether he or she appeared to be a credible person.").  Robertson, 39 F.3d at 893.

All these considerations demonstrate that Glaze was entitled to rely upon the information provided by Anderson without further investigation into his past.  Both Glaze and Gilpin met face-to-face with Anderson on January 14th and could assess on their own whether he appeared to be credible.  In addition, Anderson provided first-hand knowledge of the conspiracy that he obtained because he was living with Lysengen.  He also provided concrete evidence of the conspiracy in the form of a map of EB's residence, and a photograph the conspirators were circulating of EB.  Finally, the GFNTF independently corroborated numerous details of the facts that Anderson was reporting to them, as outlined above in the factual background section.  Law enforcement independently corroborated a plan to tamper with EB as a witness through jailhouse communications between Lysengen and his son, Anthony Haase.  Anderson reported that Wes Smith had paid a visit to EB's house, and defendant Kraft confirmed that fact through text messages directly with EB.  Law enforcement

corroborated that Smith and Lysengen knew each other.  Law enforcement further corroborated minor and innocent details, such as the fact that Lysengen had liver cancer, and had a brother who worked at a bank.  Although these minor details were unrelated to the conspiracy to harm EB, the corroboration of them permitted law enforcement to infer that Anderson was reliable and that other information he provided, even if uncorroborated, was also reliable. Keys, 721 F.3d at 518.

In sum, Howe cannot demonstrate that Glaze included any deliberate falsehoods in paragraph 12 of the arrest warrant affidavit.

### 2) Paragraph 13 accurately reports the contents of the January 24 tape-recorded meeting.

Paragraph 13 of the arrest warrant affidavit relays information that was tape-recorded during the conversation with Howe that took place on January 24. See Howe Ex. 12 (ECF 84-13). As Howe acknowledged, the tape recording speaks for itself.  An independent review of the recording establishes that paragraph 13 contains no deliberate falsehoods.

In all, paragraph 13 contains fourteen separate sentences, which will be addressed seriatim.  The first sentence states that Anderson wore a body transmitter to the January 24th meeting with Lysengen and Howe.  That is a true statement. The second sentence states that Howe does not represent Anderson and that Anderson has separate counsel for the criminal charges he was facing.  That is a true statement.   During discovery, Howe's counsel suggested during deposition questioning that Howe represented Anderson with respect to a promissory note.  The tape recording itself dispels that suggestion, where Anderson indicates he merely wants Howe to give him a *recommendation* on some other attorney he could retain for that purpose, and Howe is not even willing to make a referral:

Anderson:  One thing, you remember that note I gave you for that 400 grand?

Howe: Yeah.

Anderson: Can I get that back because I'm gonna proceed on that.

Howe: Are you?

Anderson: Yeah.

Howe: That's probably a good idea.

Anderson:  Yeah, no shit.

Howe: Okay.

Anderson:  He's a dickhead.  Paul thinks I should hire you as my attorney.

Howe: Yeah?

Anderson: Well, I thought I would come in here and ask you who a good attorney is.

Howe:  Hmmm I, you know, I don't refer anymore.

Howe Ex. 12 at 2:01:34 through 2:01:58 (ECF 84-13).  But even if Howe represented Anderson on a collection matter, any misrepresentation of that fact in the affidavit would be immaterial to the question whether probable cause existed to arrest Howe for witness tampering.  See, e.g., Schaffer v. Beringer, 842 F.3d 585, 594 (8th Cir. 2016) (requiring a misrepresentation/omitted fact to be "*clearly critical*" to the finding of probable cause before it is relevant) (citation omitted).

The third sentence of paragraph 13 summarizes the numerous statements Howe made that show his knowledge and complicity in the plan to make EB unavailable to testify against Lysengen, while sentences four through ten relay the

seven specific statements Howe made during the tape-recorded conversation that are referenced in the arrest warrant affidavit, consisting of:

(1) Howe's explanation that EB's testimony is necessary if the State proceeds to trial against Lysengen. Howe Ex. 12 at 2:18:23 through 2:20:56 (ECF 84-13);

(2) Howe's opinion that the May 22, 2013, controlled buy was the incident upon which the search warrant was issued.  Id. at 2:20:20;

(3) Howe's statement that the State's case against Lysengen is like a "house of cards" that falls down if EB is not available to testify at Lysengen's trial.  Id. at 2:20:15;

(4) Howe's advice on EB being gone 5 days before trial.  Id. at 2:21:30 through 2:21:55;

(5) Howe telling Lysengen and Anderson that the event that prevents EB from testifying at trial needs to happen more than five days before trial because otherwise it looks suspicious.  Id. at 2:22:04;

(6)  Howe giving his opinion that EB's unavailability at trial more than five days before trial gives the State longer to think about the difficulties of trial without her as a witness.  Id. at 2:21:30; and

(7) Howe's statement referencing a witness's disappearance just five days before trial that "They [referring to the State] start out with the assumption that it isn't a coincidence."  Id. at 2:22:07 through 2:22:17.

Sentences eleven through fourteen of the arrest warrant affidavit then switch to a discussion of the statements Howe made about Lysengen's preliminary hearing, which confirmed Howe's understanding that the entire conversation was about preventing EB from testifying at trial.  Sentence eleven relays the exchange in which Howe is asked whether EB will show up at the preliminary hearing, and Howe responds that the State will not have her come.  Id. at 2:38:37 through 2:38:44.

Sentence twelve refers to Howe's statement that he will likely cancel the preliminary hearing if EB does attend. Id. at 2:38:50. Sentence thirteen refers to Howe's explanation about the State being able to use EB's testimony if he cross examines her at the preliminary hearing even if she does not show up for trial. Id. at 2:39:03. Finally, sentence fourteen merely relays Glaze's opinion that the tape recording shows Howe was conspiring with Lysengen and Anderson to ensure the Confrontation Clause would not be met at the preliminary hearing, because that would negate the plans to prevent EB from testifying against Lysengen. The Court can independently review the tape recording to determine whether Glaze's opinion in that regard was reasonable. See, e.g., Cooper, 634 F.3d at 480 (discussing the reasonableness standard that governs an officer's application for a warrant based upon probable cause).

> **B.** **Defendant Glaze did not exhibit a reckless disregard for the truth by failing to include certain facts about Anderson in the arrest warrant affidavit.**

Without any evidence of a deliberate falsehood in the arrest warrant affidavit, Howe cannot survive summary judgment unless he shows that Glaze "exhibited a reckless disregard for the truth when [s]he failed to include various facts" in the affidavit. Murray, 595 F.3d at 872. More specifically, Howe alleges in his complaint that the defendants intentionally or recklessly disregarded the fact that Anderson had a "documented previous history of telling law enforcement personnel and prosecutors fictitious stories about lawyers supposedly conspiring to kill people." ECF 56 ¶11.

This claim fails for several reasons. First, and foremost, the reckless disregard claim requires Howe to show that the "material omitted would have been *clearly critical* to the finding of probable cause." United States v. Reivich, 793 F.2d 957, 961

(8th Cir. 1986) (citation omitted) (emphasis added).  Information about Anderson's background was not clearly critical in this case.  The probable cause against Howe was established by a tape recording that captured him giving advice on the timing of an event that would prevent EB from testifying at trial.  Anderson's background had no bearing on whether the tape recording established probable cause.  Stated another way, including information about Anderson's track record in the affidavit was not clearly critical where the probable cause against Howe did not depend upon Anderson's credibility.  When reviewing the totality-of-the-circumstances to demonstrate probable cause "an informant's basis of knowledge can be balanced against, rather than overruled by, that informant's lack of a track record of reliability." United States v. Fredericks, 273 F. Supp. 2d 1032, 1040 (D.N.D. 2003) (citing Reivich, 793 F.2d at 959).  Here, Anderson's basis of knowledge was recorded.  Thus, the fact that he may have been unreliable in the past was not clearly critical where the tape recording demonstrated he was reliable this time.

Second, Howe has no evidence that, at the time the arrest warrant affidavit was submitted, the defendants knew of Anderson's history of telling law enforcement about lawyers supposedly conspiring to kill people.  A reckless disregard claim requires more than just allegations that an officer intentionally or recklessly omitted relevant information from a warrant affidavit.  Cf. United States v. Crissler, 495 F.Supp.2d 1019, 1023 (D. N.D. 2007) (discussing reckless disregard in the analogous context of the showing required to obtain an evidentiary hearing to challenge a warrant affidavit under Franks v. Delaware, 438 U.S. 154 (1978)).  "Mere negligence on the part of law enforcement officers" is not enough. United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997); see also Dean v. Searcey, 893 F.3d 504, 521-22 (8th Cir. 2018) (discussing the need for recklessness vs. negligence to prevail under Section 1983 in the context of a claim for reckless investigation).

Information about Anderson's past incidents in Sarpy County, Nebraska, and Becker County, Minnesota, were not part of his criminal background. They did not result in arrests or charges, and thus were not part of his Triple I report. More significantly, the defendants were entitled to rely upon Anderson after corroborating numerous details of the evidence he provided. <u>See, e.g.</u>, <u>Keys</u>, 721 F.3d at 518. These corroborations permitted the officers to infer that the Anderson was reliable as to uncorroborated information. <u>Id.</u> Thus, Howe cannot even demonstrate that the defendants were negligent in not having further investigated Anderson's background, let alone that they were reckless in that regard.

## IV. The presence of arguable probable cause entitles all defendants to qualified immunity for all of Howe's claims.

Finally, the presence of probable cause/arguable probable cause entitles all defendants, including Gilpin and Kraft, to qualified immunity for all the claims brought against them, including the malicious prosecution claim. <u>See</u> <u>McCabe</u>, 608 F.3d at 1077–78 (indicating an officer is entitled to qualified immunity for an alleged Fourth Amendment violation "if he had a mistaken but objectively reasonable belief [a plaintiff] had committed a criminal offense, [and that a plaintiff] lose[s] even if there was merely *arguable* probable cause to support the arrest[.]"); <u>Rodenburg Law Firm v. Sira</u>, 931 N.W.2d 687, 690 (N.D. 2019) (indicating the absence of probable cause is a necessary element of a malicious prosecution claim).

> When the plaintiff in an action under § 1983 contends that an officer acted without probable cause, the officer is entitled to qualified immunity unless the "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." <u>George v. City of St. Louis</u>, 26 F.3d 55, 57 (8th Cir.1994). As this standard makes clear, there need not be actual probable cause for an officer to be shielded by qualified immunity; an objectively reasonable belief that there was probable cause is enough.

<u>Pace v. City of Des Moines, Iowa</u>, 201 F.3d 1050, 1055 (8th Cir. 2000).

Moreover, qualified immunity applies to negate Howe's claims so long as there was arguable probable cause to support the arrest for *some* crime, not necessarily the crime for which Howe was arrested. See McCabe, 608 F.3d at 1077 (noting that the lack of probable cause for the "charges actually brought against [a plaintiff] . . . has no bearing on whether the arrests comported with the Fourth Amendment, as long as there was probable cause to believe some criminal offense had been committed.") (citing Devenpeck v. Alford, 543 U.S. 146, 53 (2004)).  The tape recording that captured Howe giving advice on the timing of an event that would prevent EB from testifying at Lysengen's trial, coupled with evidence of overt acts taken by others as part of a plan to keep EB from testifying at trial, established arguable probable cause to arrest Howe for the crime of conspiracy to tamper with a witness and/or informant in a criminal proceeding in violation of N.D. Cent. Code §§ 12.1-06-04 and 12.1-09-01(1).

Under North Dakota law, the offense of tampering with a witness or informant in a criminal proceeding includes, in relevant part, using "force, threat, deception, or bribery . . . [w]ith intent to induce or otherwise cause another . . . [t]o withhold testimony . . . from an official proceeding . . . [or] . . . [t]o absent himself from an official proceeding to which he has been summoned." N.D. Cent. Code § 12.1-09-01(1). The substance of the offense is using force, threat, deception or bribery "with intent to influence another's testimony or cause another to withhold testimony in an official proceeding.  The gist of the offense is the willful and corrupt attempt to interfere with and obstruct the administration of justice."  State v. [Henry H.] Howe, 247 N.W.2d 647, 653 (N.D. 1976).  "The mere attempt is what the law makes punishable."  Id. "All that is necessary is that the person be one who knows or is supposed to know material facts and is expected to testify to them or to be called on to testify."  Id.  "It is interference with the legal system that the statute seeks to prevent."  Id. at 655.

31

The offense of criminal conspiracy under North Dakota law is defined by statute, which reads in pertinent part:

> 1.    A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy. The agreement need not be explicit but may be implicit in the fact of collaboration or existence of other circumstances.

N.D. Cent. Code § 12.1-06-04(1).

Under this statute, a criminal conspiracy contains two elements: first, "an agreement to commit an offense," and second, "an overt act to effect the offense." State v. Cain, 806 N.W.2d 597, 600–01 (N.D. 2011). As to the first element, an explicit agreement is unnecessary; the requisite agreement may be implied by "the fact of the collaboration," § 12.1-06-04(1), or "based on the parties' conduct." State v. Clark, 868 N.W.2d 363, 366 (N.D. 2015) (citing Cain, 806 N.W.2d at 601). The statute further specifies that knowledge of a co-conspirator's identity is not required: "[i]f a person knows or could expect that one with whom he agrees has agreed or will agree with another to effect the same objective, he shall be deemed to have agreed with the other, whether or not he knows the other's identity." § 12.1-06-04(2).

The second element, an overt act, presents only a "minimal" burden for the prosecution, since "almost any act in furtherance of the unlawful agreement will satisfy the overt-act requirement." State v. Howard, 960 N.W.2d 775, 778–79 (N.D. 2021). Further, the overt act need not be committed by the defendant. State v. Keller, 695 N.W.2d 703, 712 (N.D. 2005). Rather, a qualifying act "of any conspirator" may be attributed to the other members of the conspiracy. Id. at 716 (citing State v. Lind, 322 N.W.2d 826, 844-45 (N.D. 1982)).

Probable cause existed to arrest Howe for the crime of conspiracy to tamper with a witness or informant. Overt acts in furtherance of the conspiracy were

committed by Smith and Lysengen (i.e., preparation of a map of EB's residence, distributing a photo of her to others who may not know what she looks like, devising a ruse to meet her to discuss antiques).   The January 24 tape recording establishes that Howe was aware of the plan to prevent EB from testifying at trial against Lysengen.  See Howe Ex. 12 at 2:26:14 (ECF 84-13) (Howe responding "Yeah" when Anderson says "Well, we'll get Paul with his sketch pad and make sure [EB] goes away and then he can go to court and go away and I mean away this way, not away that way").   Aware of the plan, Howe gave advice to Lysengen and Anderson about the timing of the event that would prevent EB from testifying.  Id. at 2:21:30.   And as Howe himself acknowledged, giving advice on how to commit a crime makes you a co-conspirator.   Howe Depo 317:14–318:11 (ECF 84-1).  All defendants, including Gilpin and Kraft, are therefore entitled to qualified immunity for all the claims alleged against them in the complaint.

## CONCLUSION

Howe's claims are based upon the flawed premise that the defendants were obligated to dig deep into Anderson's criminal background notwithstanding the fact that they had independently corroborated many things he reported to them. But even more fundamentally, Howe's own words -- caught on tape – established the basis for his arrest and thus probable cause did not depend upon Anderson's credibility. State defendants Gilpin and Kraft request the Court to grant their motion for summary judgment and to dismiss all claims against them.

Dated this 1st day of October, 2021.

State of North Dakota
Wayne Stenehjem
Attorney General

By:      /s/ James E. Nicolai
         James E. Nicolai
         Deputy Solicitor General
         State Bar ID No. 04789
         Office of Attorney General
         500 North 9th Street
         Bismarck, ND 58501-4509
         Telephone (701) 328-3640
         Facsimile (701) 328-4300
         Email jnicolai@nd.gov

Attorneys for State Defendants.